THE STATE OF CONNECTICUT *vs.* ERASMO PERRETTA
ET AL.

First Judicial District, Hartford, January Term, 1919.

PRENTICE, C. J., RORABACK, WHEELER, BEACH and GAGER, Js.

An exception should be taken to a ruling admitting testimony, in order to make such ruling a ground of error.

A motion to strike out testimony is faulty which fails to point out what and how much of the evidence is claimed to be objectionable, and which, moreover, does not give any reason why the motion should prevail.

It must be assumed that a witness who testifies to the dying declarations of the deceased and who questioned him relative to the homicide, was diligently trying to get a complete and accurate statement of the event; and therefore an assertion to that effect made by the witness while on the stand, although unnecessary, is harmless.

Dying declarations may be made in response to questions, and if they are, the questions are admissible in evidence in connection with, and in explanation of, the answers of the decedent.

The presence or absence of the accused at the time a dying declaration is made, does not affect its admissibility in evidence.

Evidence that the decedent distinguished between his assailants and others when he made his dying declaration, is admissible to show his mental condition.

A witness who telephoned to the police may be allowed to testify that he did so in consequence of information obtained by him from the decedent as he lay upon the ground after being shot. The admission of such evidence does not violate the hearsay rule, since no statement made by the decedent is given, but only the fact that he made some answer to the inquiries put to him by the witness.

Whether the claims made by a litigant are true or not in point of fact, is a question for the jury: it is only where the claims are erroneously recited that this court can correct the finding.

It is the duty, as well as the privilege, of counsel, to call the attention of the court at the time to a wrong assumption of fact in the charge, if one is made.

A possible wrongful assumption of fact in a charge respecting a trivial matter, will not be treated as reversible error even in a capital case, if the jury were expressly informed that they were to pass upon all matters of fact uninfluenced by any views or comments of the court, and if it is apparent upon the charge as a whole that they could not have been prejudiced by the assumption in question.

The State *v.* Perretta.

Under the rules (Practice Book, 1908, page 236, § 116, page 266, § 5) an objection to the admission of testimony should state, succinctly, the grounds upon which it rests; and unless this is done, the ruling ought not to be made a reason of appeal and urged in this court upon grounds which were not before the trial court when its decision was made.

Argued January 10th—decided March 4th, 1919.

INDICTMENT for murder in the first degree, brought to the Superior Court in Hartford County and tried to the jury before *Burpee, J.;* verdict and judgment of guilty against each of the accused, from which they appealed. *No error.*

The accused were tried on the charge of murder in the first degree, found guilty and sentenced. An appeal was taken, based on claims of error in the admission of testimony and error in the charge of the court.

It appears from the record that one Dr. Elcock was called in behalf of the State, and examined to show dying declarations by the deceased. After testifying as to the condition of the deceased, and that the two accused were brought into the presence of the deceased, the witness proceeded as follows, viz: "I had the two men brought in, and without a question on my part I had them brought up close to me, and he reached out and he grabbed hold of the arm of one of the men, and he says 'These men shot and stabbed me—he cut and stabbed me, and the other one,' identifying him, he said 'he shot me.' Q. Which one did he take by the arm as having cut and stabbed him? A. The one sitting on the left over there—I don't know his first name. Q. (Pointing to Joseph Perretta) At that time, whether or not Joseph Perretta had a moustache? A. He did. Q. Now, go ahead. After this man said that, when you had the accused brought in, what else was said? A. Without my asking him any question at all, he grabbed the man by the sleeve of his coat,

and he says 'This man cut and stabbed me.' Those were exactly the words he used. And then he pointed to the other one—he could not reach him anyway—and he said 'He shot me.' I says 'You must have had a fine fight down there.' He says 'No, no fight.' Well, I says, 'We don't get a man cut and shot and stabbed without getting into trouble, or somebody getting into some kind of a fight'; and he said 'No trouble, I walk home, I go home.' I says 'Where do you live?' and he answered 'On Beaver Street.' I says 'Do you mean to tell me that you were walking along the street quietly and these two men came up and assaulted you in this way?' He says 'Yes, they did.' Why, I reiterated that statement, taking it from different angles, for I guess ten minutes after that, trying—Q. You cross-examined him, did you? A. Yes, to prove to myself that he knew, and that it was true that this man was walking along the street quietly and inoffensively, and all of a sudden was pounced upon by the two men. And then I said to him—Mr. Pierce: I object to the conversation if not in the presence of the accused. Q. That was in the presence of the accused—they both were there? A. Both were there, yes. Mr. Pierce: I object. I don't think what he says is quite admissible. The Court: It is all a part of one conversation, as I understand it, that he had with the deceased in the presence of the accused relating to the affair. Mr. Pierce: It is the statements of the deceased, it seems to me, that are admissible. Evidence cannot be admitted against the accused, in other words, by the statement that this man makes. The Court: What the accused said is what we are trying to find out. He should confine himself to what the accused said. It may be necessary to show what he said in order to make what the accused said understandable. Of course, they will both have to come in. Q. Go ahead. A.

Well, in order to find out surely—Mr. Pierce: One moment; I move to strike out all he said about his testimony. The Court: Motion overruled and exception noted in favor of defense. A. In order to make sure that there had been some cause for trouble I asked him if he had ever had any trouble with these two men and he says 'Yes.' I said 'When?' He says 'Six months.' Mr. Pierce: I understand this comes under my objection. The Court: Yes. Exception noted. A. I then asked him if he had ever had any trouble with anybody else—this was the latter part of the conversation. While I was doing this one of the accused rather broke in the conversation several times and he said, 'Yes, he had had trouble with Luigi.' Q. With whom? A. Luigi. Q. Luigi. A. It was difficult for me to understand just what he said, whether Luigi or Lewis, but I concluded before I got through that he meant Luigi; and when I asked him when he had trouble with Luigi, he said 'A long time.' Q. Now, did you ask him who this Luigi was—whether he was a relative of the accused at that time? A. No, sir; I did not ask him anything with reference to Luigi. Q. All right, go ahead. A. He reached toward these two men on two occasions, taking hold of the sleeve of one of them on two occasions. I went back and waited several minutes before I asked him the question again and then he grabbed the man by the sleeve and said he had cut and stabbed him, and the other one had shot him. I got Dr. Cooley to stand up beside the bed to make positive that the man knew what he was talking about, and I says 'Did this man ever injure you?' and he looked at him and he says 'No, I don't know him.' Q. That was Dr. Cooley? A. Yes."

The testimony of McMurray is sufficiently stated in the opinion.

The court, in part, charged the jury as follows, viz:

The State *v.* Perretta.

"Further on, the doctor [Elcock] asked him if he had had any trouble with Luigi, the brother of the accused, and he said 'A long time.'

"During this examination of the dying man, and while he was giving his testimony, this witness said that he was interrupted by one of the accused. Immediately after the doctor had asked the dying man if he had trouble with any of them and he said 'Yes, six months,' one of the accused said 'Yes,' he had had trouble with Luigi; and thereupon it was that the doctor asked the dying man if he had had trouble with Luigi, and he told him in effect that he had had trouble a long time ago. It is for you to determine just what weight and bearing you will allow that evidence to have. You will consider whether, in the first place, it indicates that this man had had trouble with the accused, some time ago. He says 'six months.' While you are considering that question, you must bear in mind the fact that both of the accused have denied it. You will bear in mind also the other evidence produced both by the State and by the accused to show some quarrel that had taken place there, a trivial matter, a year and two months before the murder. As I say, you will consider this evidence with respect to the motive and also with respect to the accuracy of the identification. You will also call to mind that Luigi, the brother of the accused, was called to the stand, himself; and that he said that it was true that he and the accused man did have some wrangle—some words—a long time ago, and that it had all passed over, that they were all good friends again, and that 'they drank together and were on good terms.' That testimony, if you see fit to so use it, may be used as corroborating the accuracy of the statement made by the dying man during this identification. There is another construction of the

evidence to which I must call your attention, but without any suggestion that you are to accept the construction that I have in mind. The doctor had asked the dying man if he had had trouble with these men, and he said 'Yes, six months ago,' when one of the accused immediately interrupted, and he said he had trouble with Luigi, the brother of the accused. From that evidence, if you deem it fair and reasonable and think that the conclusion is warranted, you may draw the inference that the accused then and there attempted to divert suspicion from themselves to another person. You are not obliged to draw that inference. I do not say that the court draws that inference. It is within your province to make that inference if you find that it is a reasonable, fair, just, logical inference to draw from those words and that conduct of one of the accused. I ought to say, if perchance somebody might deem it necessary, that you are not bound by the conclusions of the court concerning the evidence and the conclusions you shall reach upon it. You are to consider the evidence for yourselves. You are to decide what facts have been proved, without being influenced by the court; and for that reason I have laid before you fully all the principles of the law in relation to the crime charged here, so that if you desire you may, yourselves, decide whether or not it was murder when this man was slain. Now, gentlemen, at the end I wish to say to you that you should pay careful attention to all the evidence in this case. It has not been the intention of the court to recite all the evidence to you. If the court has omitted to make reference to some portions of the evidence, you should not draw the inference that the court does not think that evidence important or worthy of notice. It is for you to decide that. It is for you to recall the evidence. It is for you to give the

weight to it which in your judgment you think it should have."

*Noble E. Pierce* and *Patrick F. McDonough,* for the appellants (the accused).

*Hugh M. Alcorn,* State's Attorney, for the appellee (the State).

GAGER, J. The first two assignments of error relate to the testimony of Dr. Elcock. It is claimed, first, that the court erroneously admitted this testimony over the objection and exception of the accused; and second, that the court erroneously overruled the motion of the accused to strike out. These objections relate only to part of the testimony set out in the foregoing statement of facts. The objections made with respect to the other testimony printed in the record were sustained by the court in a way which could leave no cause for complaint. In the part of the testimony to which the appeal applies there was a brief running conversation between counsel and the court and no exception then was taken based upon the objection. There was no error on the first reason of appeal, because the alleged fact of an overruled objection and exception did not exist.

The real question, if any, arises upon the second reason of appeal based upon the refusal of the court to strike out, which was excepted to. The motion, referring to testimony of Dr. Elcock, was: "I move to strike out all he said about his testimony." The motion itself is faulty because it does not clearly appear what or how much was meant by "all he said about his testimony," and because no reason is given to the court why the motion should be granted. A granting of the motion as made would have left the court and

jury quite in the air as to what remained in and what went out.

Waiving, but by no means sanctioning or approving, these defects, an examination of the record will show that the motion must have been directed to one of two sets of statements; either what the witness said upon the stand about his examination of the deceased, or his statement of the questions put by him to the deceased. As to the former, there are but three; the witness was detailing his repeated questioning of the deceased when the question was put to the witness: "You cross-examined him, did you?" to which the answer was, "Yes, to prove to myself that he knew, and it was true that this man was walking along the street quietly and inoffensively, and all of a sudden was pounced upon by the two men." Neither the question nor the answer were objected to. These facts had already fully appeared in the narration of the statement of the deceased without objection. This statement by the witness was but saying that he was satisfying himself, by repeated examinations, that the deceased knew what he was saying and that the deceased was saying what he really intended. Again, the witness said: "In order to find out surely . . . In order to make sure that there had been some cause for trouble I asked him," etc. Both of these statements meant simply, and could only mean, that the witness was diligently trying to get a complete and accurate statement from the deceased. As a statement of the witness' mental operations in conducting the examination it was unnecessary, but could do no harm, and the witness did not state his own opinion as to the truth of the statements of the deceased. Such an attitude of mind must be assumed as taken and maintained by one examining a deceased for his voluntary statement, if the examination and statements are to be of real probative value.

Bearing in mind that the only question about Dr. Elcock's testimony arises from the motion, and that this refers only to what Dr. Elcock said, we think the real point claimed is that Dr. Elcock should not have been allowed to narrate his questions as put to the deceased. That the motion relates and was intended to relate to these questions, is apparent from the objection and the discussion between the court and counsel, as well as from the portion of Dr. Elcock's testimony quoted in appellants' brief. The following quotation from the statement of facts makes this quite clear: "Dr. Elcock: And then I said to him—Mr. Pierce: I object to the conversation if not in the presence of the accused. Q. That was in the presence of the accused—they both were there? A. Both were there, yes. Mr. Pierce: I object. I don't think what he says is quite admissible. The Court: It is all a part of one conversation, as I understand it, that he had with the deceased in the presence of the accused relating to the affair. Mr. Pierce: It is the statements of the deceased, it seems to me, that are admissible. Evidence cannot be admitted against the accused, in other words, by the statement that this man makes. The Court: What the accused said is what we are trying to find out. He should confine himself to what the accused said. It may be necessary to show what he said in order to make what the accused said understandable. Of course, they will both have to come in. Q. Go ahead. A. Well, in order to find out surely—Mr. Pierce: One moment; I move to strike out all he said about his testimony. The Court: Motion overruled and exception noted in favor of the defense." It appears, also, that the ground of the objection as originally taken was that it was a statement not made in the presence of the accused; but the witness testified that both were present. Further, as it was a case of a dying declara-

tion, it made no difference whether the accused were present or not.

There is no merit in the objection or motion based upon this ground. It is one of the most firmly settled rules in cases of dying declarations, that when the declaration is made by question and answer the entire conversation, question and answer, should be given so far as possible. In *Reg.* v. *Mitchell*, 17 Cox C. C. 503, 507, where the declaration was by question and answer, it was said by Cave, J.: "In such circumstances the form of the declaration should be such that it would be possible to see what was the question and what was the answer, so as to discover how much was suggested by the examining magistrate, and how much was the production of the person making the statement." In the often-cited case of *Commonwealth* v. *Casey*, 65 Mass. (11 Cush.) 417, Chief Justice Shaw giving the opinion, the syllabus is: "T, being at the point of death, and conscious of her condition, but unable to speak articulately, in consequence of wounds inflicted upon her head, was asked whether it was C who inflicted the wounds; and, if so, she was requested to squeeze the hand of the person asking the question. Thereupon, she squeezed the hand of the person making the inquiry. *Held*, that under all the circumstances of the case there was proper evidence against C for the consideration of the jury; they being the sole judges of its credibility, and of the effect to be given to it." In Chamberlayne on Evidence (Vol. 4) § 2842, it is said: "It is not regarded as objectionable that the statement, oral or written, is made in response to questions, even those which are leading in their nature. That the declarant is *urged* to make his statement, does not destroy its voluntary character or have the effect of excluding it. Such an insistence affects, like the use of questions, merely the probative force of what is said."

So are the authorities generally. 56 L. R. A. note, pp. 427, 429, e. g.; 2 Wigmore on Evidence, § 1445; 21 Cyc. 979; Wharton on Homicide (3d Ed.) p. 1020.

Objection also seems, from appellants' brief, to be taken to the statement of Dr. Elcock, as follows: "I got Dr. Cooley to stand up beside the bed to make positive that the man knew what he was talking about, and I says: 'Did this man ever injure you?' And he looked at him and he says 'No, I don't know him.'" This was entirely proper as showing the mental condition of the deceased at the time of his declarations. *Commonwealth* v. *Casey*, 65 Mass. (11 Cush.) 417.

The third ground of error alleged is the admission of McMurray's testimony. It appears that McMurray had been in the neighborhood and heard a shot and screams, and found the deceased lying upon the ground with his face down. McMurray was called as a witness by the State. The record shows the following examination and answers: "Q. Now what did you do? A. I stepped up to him and asked him who shot him. Mr. Pierce: I object to the conversation. Q. You asked that question did you? Now don't tell what was said, but state whether or not he made a reply to you? A. He did. Q. Answer this yes or no. State whether or not he told you who shot him? A. Yes. Q. State whether or not you repeated your question? A. I did. Q. And state whether or not he repeated his answer? A. He did. Q. Now just what did you observe further about the man? Mr. Pierce: I move that all of that be stricken out. The Court: The motion is denied. Mr. Pierce: Exception. The Court: Yes. Q. What then did you do? A. You mean after I spoke to him? Q. Yes, after you talked with him. A. I proceeded to telephone the police. Q. And did you go to telephone? A. I went into a house on Whiting Street."

Here, again, the objection and motion are defective,

No reason was given for the objection. There was no ruling on the objection and there was no exception. The objection as taken was evidently intended to shut out the answer, and this was accomplished. No reason was given for the motion, nor is the part desired to be stricken out definitely specified. The objection now raised is that it is not shown that the necessary conditions to justify the statements of the deceased as a dying declaration were shown to exist when this conversation took place, and that this examination was a palpable evasion of the rule as to dying declarations. An answer to this claim of error is that the record does not show that the evidence was offered or claimed as a dying declaration, or that any declaration in fact was asked for or given. If the evidence was admissible for any purpose there was no error in denying the motion, especially in view of the fact that no reason was given. It was admissible on two grounds: it was relevant to show the mental condition of the deceased after the stabbing and shooting and prior to the taking of the dying declaration. It was further admissible as an act of the witness in connection with his procuring information and telephoning the police. The situation is this: The witness asked a specific question of the deceased; the deceased made an answer; what the deceased said was not stated; then the witness did something. The only part as to which any possible question could arise was the detail of the question asked, viz: "I asked him who shot him." Whether this was technically erroneous we need not consider, as no claim is made in this respect and upon the record it was harmless. The information placed before the jury differed in not the slightest degree from what would have been given had the witness simply stated that he made inquiries of the deceased and in consequence he telephoned the police. In *Reg.* v. *Wilkins,*

4 Cox C. C. 92, the witness, a constable, having stated that by inquiries he traced the prisoners from place to place, and counsel for the prisoners having objected that this was in effect letting in hearsay evidence, Earle, J., admitting the testimony, said: "Half the transactions of life are done by means of words. There is a distinction, which it appears to me is not sufficiently attended to, between mere statements made by and to witnesses, that are not receivable in evidence, and directions given and acts done by words, which are evidence. The witness, in this case, may say that he made inquiries, and in consequence of directions given him in answer to these inquiries, he followed the prisoners from place to place until he apprehended them." The testimony objected to is simply as to one of the steps taken by the witness leading him to telephone the police. The hearsay rule is not involved, for no statement of the deceased is made; only the fact that an answer was made is given; what the answer was was not called for or given. *Reg.* v. *Wilkins* is quoted with apparent approval in Wigmore on Evidence (Vol. 3) § 1789, and in Chamberlayne on Evidence (Vol. 4) § 2666.

There was no error in refusing to correct paragraph 17 of the finding, nor will this court correct it. This paragraph was part of a finding made for appeal from the charge to the jury. Such a finding is a statement of what counsel claimed and offered evidence to prove, and this paragraph is a statement of the State's claim. No suggestion is made that as such it is not correct. Whether or not the statement was true was for the determination of the jury and not the court. *Sansona* v. *Laraia*, 88 Conn. 136, 90 Atl. 28.

The claimed error in the charge appears to be based solely on the idea that the court erroneously assumed as an unquestioned fact a statement of fact not proven,

which was harmful to the defendants.  The court said: "There is another construction of the evidence to which I must call your attention, but without any suggestion that you are to accept the construction that I have in mind.  The doctor had asked the dying man if he had trouble with these men, and he said 'Yes, six months ago,' when one of the accused immediately interrupted, and he said he had trouble with Luigi, the brother of the accused.  From that evidence, if you deem it fair and reasonable and think that the conclusion is warranted, you may draw the inference that the accused then and there attempted to divert suspicion from themselves to another person.  You are not obliged to draw that inference.  I do not say that the court draws that inference.  It is within your province to make that inference if you find that it is a reasonable, fair, just, logical inference to draw from those words and that conduct of one of the accused."

Counsel for the defendants say that it was not so; that neither of the accused interrupted Dr. Elcock in his examination of the deceased and said that the deceased had had trouble with Luigi, but that it was the deceased himself who said this, and that consequently no inference of an attempt to divert suspicion should have been suggested to the jury because of this statement.  Turning to Dr. Elcock's testimony, all that appears with reference to this matter is the following: "A. I then asked him if he had ever had any trouble with anybody else—this was the latter part of the conversation.  While I was doing this one of the accused rather broke in the conversation several times and he said, 'Yes, he had had trouble with Luigi.' Q. With whom?  A. Luigi.  Q. Luigi?  A. It was difficult for me to understand just what he said, whether Luigi or Lewis, but I concluded before I got through that he meant Luigi; and when I asked him when he

had trouble with Luigi, he said 'A long time.'" From this record we do not think that it could be said with certainty whether it was one of the accused or the deceased who said this. The use of the pronouns leaves the statement of the witness, Elcock, hopelessly involved. From the manner and accent of the witness as he gave his testimony it may have been perfectly clear, to one listening to the testimony, who was meant. It does not appear that counsel called the attention of the court to this error of fact, if there was one, at the time. This is not only the privilege of counsel, but his duty. However that may be, the court did not instruct the jury that this was the unquestioned fact, but, though commenting on this version of the evidence, explicitly left the question of fact to the jury. The court said: "I ought to say, if perchance somebody might deem it necessary, that you are not bound by the conclusions of the court concerning the evidence and the conclusions you shall reach upon it. You are to consider the evidence for yourselves . . . without being influenced by the court. . . . Now, gentlemen, at the end I wish to say to you that you should pay careful attention to all the evidence in this case. . . . It is for you to recall the evidence. It is for you to give the weight to it which in your judgment you think it should have." In the charge the court called attention to the testimony of Luigi himself that there had been a quarrel between himself and the deceased, but that it had all been made up between them. The controversy was not as to the fact of the quarrel, which appears to have been conceded, but as to whether in Dr. Elcock's testimony it was one of the accused or the deceased who called attention to it. Upon the whole case we do not think that the defendants could have been prejudiced by the portion of the charge complained of, taken with the rest of the charge that

has been placed before us, in which the jury are properly instructed as to the determination of matters of fact where the court may have commented on the facts. In any event, this matter was the merest side issue, and at the trial apparently was so considered, for it appears in the finding of defendants' claims: "33. The accused took the witness-stand in their own defense and each denied that he had anything to do with the death of Palmese. Neither of them, however, in their testimony alluded to the events at the hospital as hereinbefore recited nor did they, or either of them, deny or attempt to explain in any way the repeated identification made by Palmese at the hospital, of Erasmo Perretta as the man who fired the fatal shot and of Joseph Perretta as the man who cut and stabbed him."

Although on account of the gravity of the case we have waived any defects in the form of the record in this case, and have endeavored to answer such plausible reasons as might have been given, yet we call special attention to Rule 5 of the Supreme Court of Errors (Practice Book, 1908, p. 266), which requires that "when error is claimed in rulings upon evidence of witnesses, upon a trial either to the court or to the jury, the finding should state in each instance the question, the objection, the exception, and the answer, if any." "Objection" here means, not merely that there is objection, but what the objection is. Section 116, Rules of Superior Court (Practice Book, 1908, p. 236), provides that "whenever an objection to the admission of testimony is made, counsel shall state the ground of the objection succinctly and in such form as he desires it to go upon the record, before any discussion or argument is had thereon. No ruling relating to the reception or rejection of evidence will be reviewed unless the record discloses that an exception to such ruling was duly taken."

We know that these rules are sometimes violated in practice. If counsel, when making an objection or a motion, cannot state any reason on which to base it, and thus fairly inform the court as to the nature of the ruling it is called upon to make, the objection should not be made a ground of appeal for reasons subsequently developed and which were not before the court at the time of the ruling. *Zalewski* v. *Waterbury Mfg. Co.*, 89 Conn. 46, 92 Atl. 682; *Leahy* v. *Cheney*, 90 Conn. 611, 617, 98 Atl. 132.

There is no error.

In this opinion the other judges concurred, except WHEELER, J., who dissented.